BOWLING, Justice,
for the Court:
This is a Workmen’s Compensation case appealed from the Circuit Court of Attala County. The basis of the claim was the death of John Curtis Webb that occurred on August 15, 1980. His alleged dependents contend that at the time of his death, he was engaged in the course of his employment with appellee Guthrie Hunter. The administrative judge, a majority of the compensation commission, and the circuit court entered orders denying compensation benefits to the appellants. One member of the commission filed a dissenting opinion.
There is no real conflict involved in the cause as to what occurred leading to the death of John Curtis Webb. For a number of years he had been employed by appellee Hunter as a construction equipment operator with other duties involving ordinary labor in connection therewith. Hunter Construction had a contract to place what is commonly known as “rip-rap” on stream banks that ran under roadway bridges. The road involved here is not identified in the record except as being in Attala County. At the time of the particular phase of the job involved before us, the road ran in a north-south direction and the stream ran east and west. The obligation of the employer was to place approximately 200 feet of “rip-rap” on both sides of the stream. Briefly, this was done in the following manner. The employees would level the stream banks with construction equipment which included making a “toe-ditch” at the lower edge of where the “rip-rap” was to be placed. The heavy equipment would then be placed aside and the remainder of the work done by the men without mechanical assistance. At the time of Webb’s death, there were four employees at the scene. *1132 The incident occurred between 9:30 and 10 a.m. The foreman of the crew was Leno Hall. There were three other employees: Olyon Davidson, David Hill and the deceased, John Curtis Webb.
The foreman, Hall, testified that shortly before Webb drowned in the stream, he was going to the truck parked near the bridge when he [Hall] met the three employees coming back from their break. He told them that a couple would have to remove their shoes and work in the toe-ditch to complete the job. At this time, practically all the bank on the south side of the stream had been completed. It was now necessary to hand pick debris that was over the entire area of the bank, so that what is known as filter cloth could be laid by hand. The rip-rap would then be laid by hand on the filter cloth. The width of the stream bank was approximately 30 feet. The testimony of all surviving employees was that the toe-ditch varied in distance from the edge of the water. In this regard, one of the principle parts of the evidence was the foreman’s testimony as to a description of the stream and the toe-ditch. This alter ego of the employer stated that for practically the entire 200 feet, the bottom of the stream could be seen and that it was from 1 to IV2 feet deep. As hereinbefore stated, the preparation of the area to be rip-rapped was nearly completed and would end at what later developed to be a “blow hole.” The rip-rap was to stop adjacent to this area. One of the most important parts of the foreman’s testimony was that at the blow hole the toe-ditch was “right at the edge of it [the stream]”. He did state that in places the toe-ditch was from five to ten feet from the stream, but in other places it was closer. When asked precisely “would the toe-ditch actually run off into the blow hole?” he replied, “it came, yeah, right at the edge of it.”
Davidson, Hill and the deceased were engaged in cleaning debris from the stream slope near the blow hole. The deceased was at the toe-ditch which contained approximately two feet of water that had seeped’ into it from the stream. He was barefooted, but otherwise fully clothed, with his clothes containing whatever was in his pockets. The record does not reflect what was removed from the clothing of the deceased after his body was recovered. Davidson and Hill were further up on the bank slope looking in another direction when they heard a splash. They looked around. The only conflict in the evidence that could be said to be material is that Hill testified that when he looked around, he saw the deceased “coming up” about four to five feet from the edge of the stream. Davidson stated that it appeared to him that the deceased had gone out into the blow hole about ten feet.
Davidson and Hill called to Webb to get out of the stream and finish the work. At about this time, Webb began calling for help, disappeared from sight and was drowned.
Davidson went into the water but could not find the body. He testified that the blow hole was deep. The employer’s foreman, Hall, came down and jumped into the water at the area where the deceased went in and stated that the water was over his head at the edge of the stream.
Appellees contended that at the time of his death, Webb was not performing services in the course of his employment and was merely engaging in a “frolic.” The administrative judge agreed with these contentions. His findings, the most important being, “that the evidence is insufficient to establish that the deceased was engaged in his employer’s business at the time of his drowning” and “that at the time of the deceased’s drowning, he was swimming on a personal ‘frolic.’ ” As stated, the opinion of the administrative judge was affirmed by a two-one majority of the commission and their finding was affirmed, without any further findings of fact, by the circuit court.
We hold that the opinions of the administrative judge, the majority of the commissioners, and the circuit court were clearly erroneous and that the cause should be reversed and remanded for further proceedings as to benefits, if any, owed appellants.
*1133 An example of the erroneous findings of the administrative judge and the commission majority is the finding as fact that “the toe-ditch next to the area where deceased drowned was as much as five to ten feet from the stream and had two feet of water in it.” This statement is erroneous as clearly shown by the record. In the first place, it is undisputed that the toe-ditch had approximately two feet of water in it where deceased got into the stream, and it does not take a hydraulic engineer to determine that the stream water did not seep up-hill on a 2-1 slope for five to ten feet.
Furthermore, the foreman, the alter ego of appellee employer, testified that the toe-ditch actually ran off into the blow hole and was right at the edge of it.
The commission majority found that the administrative judge correctly held that the deceased was at the time of his death engaging in a “frolic.” There was absolutely no evidence in this record to sustain the affirmative defenses of appellees that the deceased was engaged in a frolic. No one saw him get into the water. They heard a splash when the deceased was working in the water-filled toe-ditch at the edge of the blow hole. The deceased was bare-footed and the area was slippery. He got into the water fully clothed, without taking anything out of his pockets. He came up to the surface, a short distance from the edge of the stream, and immediately began trying to get back to the land, but called for help as he went under and drowned.
The commission majority relied on the cases of Collier v. Texas Construction Co., 228 Miss. 824, 89 So.2d 855, (1956), Suggestion of Error Overruled, 228 Miss. 824, 830, 90 So.2d 390 (1956), and Persons v. Stokes, 222 Miss. 479, 76 So.2d 517 (1954). An examination of those cases shows no resemblance to the undisputed facts in the case sub judice. In Collier, the deceased and his fellow employee were to cross the Pasca-goula River in a motor boat. The deceased jumped into the water to swim for the admitted purpose of cooling off, although he was admonished not to do so and refused to get into the boat where his fellow employees were being transported. In Persons, there was no doubt that the employee and a fellow employee with the knowledge of all, completely abandoned their employment and went squirrel hunting.
In this case, the employee was out in a swamp at the edge of a deep hole of a stream, undisputedly performing his employment duties. In some unknown manner, he got into the water at the place where he was working and drowned. Under the admitted duty of the commission, the lower court and this Court, considering the interpretation to be placed on the Workmen’s Compensation law, it would be a complete miscarriage of justice to hold under the facts hereinbefore stated that the deceased was not in a place in which he was put by his employer at the time of his death. Not only was there no proof on the finding that he was engaged in a “frolic”, but if we use that assumption, it certainly would be a more valid assumption to find that in the position and location where the deceased was, that he fell into the stream. A finding of “frolic” is clearly erroneous under the testimony in the record. The deceased was barefooted, at a slippery area, where, according to appellee’s foreman, he was working in water at the edge of the deep hole. It is certainly more reasonable to assume that he slipped in the water and, as stated by the witnesses, came up near the edge of the water over his head and could not extricate himself before drowning.
In Retail Credit Co. v. Coleman, 227 Miss. 791, 86 So.2d 666 (Miss.1956), we stated:
In proving that an accident took place in the course of one’s employment a claimant is not bound by the preponderance of evidence rule or the rule of proof beyond and to the exclusion of a reasonable doubt as in criminal cases. He is required to prove or show a state of facts from which it may be reasonably inferred that the deceased was engaged in the Master’s business when the accident took place. (86 So.2d at 670). (Emphasis supplied).
In M. & W. Construction Co. v. Bugg, 241 Miss. 133, 129 So.2d 631 (1961), we stated:
*1134 In order to render an injury and death non-compensable on the grounds that an employee working for the Master had deviated from his duties, the testimony must be sufficient to constitute abandonment and a mere deviation or departure by a servant from a strict course of duty, although for a purpose of his own, does not in and of itself constitute such a departure from the Master’s business as to relieve from liability for the servant’s act on the ground that the servant has deviated from his service. (129 So.2d at 634).
Considering the above quotes, suppose during the course of work, the deceased had walked the few feet to the highway for the purpose of deciding whether or not it was going to rain on his crops that night and was struck by lightning and killed. Would anyone argue that his dependents were not entitled to compensation? In our opinion the facts in the case sub judice, as hereinbe-fore related, offer no more comfort to ap-pellees than the above hypothetical.
We find that the administrative judge, the commission majority and the circuit court were in error in holding that the evidence in this case required or justified a finding that at the time of his death, the deceased had engaged in a deviation from his employment, or was engaged in a “frolic.” Such findings were manifestly in error. The cause is therefore reversed and remanded to the commission for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.